[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON PLAINTIFF'S APPLICATION FOR PREJUDGMENT REMEDY
 FACTS
On June 15, 1999, the plaintiff and the defendants entered into a sales agreement under which the plaintiff agreed to sell and the defendants agreed to buy the residential property at 2 Newton Ponds in Woodbridge.
Just prior to closing, a title search conducted by an attorney representing the defendants disclosed a Surface Water Agreement (SWA) encumbering the subject property. This agreement was recorded on the land records on December 19, 1997 and was executed by this plaintiff and the owners of an adjoining parcel, Alan and Winifred Elton. By its terms, the defendants, had they purchased the property in question, would have been obligated, with their heirs, successors and assigns to: (1) Maintain all improvements to 2 Newton Ponds so as to ensure the free passage of surface water across Lot 2 (the subject property); (2) Reimburse the Eltons, their heirs, successors and assigns for any costs incurred by them to repair any damage to the driveway or other improvements on the Elton property caused by ponding on or inundation of the Elton property; and (3) To maintain a landscape buffer between the two adjoining properties with fifteen (15) fir trees or similar trees, seven CT Page 1421 (7) fee apart, planted along the easter border of 2 Newton Ponds. The Surface Water Agreement also called for the payment of costs and attorney's fees incurred by the Eltons in any legal action to enforce the provisions of the agreement.
The defendants elected not to proceed with the closing, essentially asserting the position that the SWA constituted such a defect as to render the title unmarketable. The sales agreement of June 15, 1999 (Section 12) addresses the subject of "Marketable Title" and states that the title to be conveyed shall be marketable as determined by the Standards of Title of the Connecticut Bar Association.
 DISCUSSION I
Both sides cite as leading cases on the subject of "marketablilty"Perkins v. August, 109 Conn. 452 (1929) and FrankTowers Corp. v. Laviana 140 Conn. 45 (1953). Both cases are referred to in the Standards of Title, specifically comments 3 and 4 to Standard 1.1:
 "EXAMINING ATTORNEY'S ATTITUDE
The purpose of an examination of title is to secure for the attorney's client a title which is in fact marketable, even though marketability may not appear on the land records, subject to no other encumbrances than those expressly provided by the client's contract. Objections and requirements should be made only when their regularities or defects present a real and substantial probability of litigation or loss.
Comment 3. Neither the unwillingness of a vendee to accept a title nor the fact that the title is not satisfactory to his attorney renders a title unmarketable. A title defect will not render a title unmarketable unless it presents a real and substantial probability of litigation or loss, which will prevent it from being sold at a fair price to reasonable purchaser or mortgaged to a party of reasonable prudence as a security for a loan. Perkins vs. August, supra at 456; Frank Towers Corp. vs. Laviana, supra at 52. CT Page 1422
Comment 4. When a vendee or lender refuses to accept a title because of a claimed defect, it is not the function of the trial court to try the title, but rather to determine whether it is free from reasonable doubt, in law or in fact. Frank Towers Corp. vs. Laviana, supra at 53: Cole vs. Steinlauff, 144 Conn. 629, 632." (Emphasis added)
In this case, the defendants consulted James Nugent, an attorney whose specialty is real estate law. He concluded that this title was unmarketable largely because of the serious uncertainties involved. Specifically, he noted, that the SWA had been in existence only since December 19, 1997 and hence no "history" could be ascertained to be relied on in evaluating its impact. He further stated that the SWA terms with no cap as to time, limit of liability, or frequency of suit rendered it a serious encumbrance.
Mr. Nugent's opinion and comments are particularly significant in light of the language of the introduction to the Standards of Title. This language, cited in the defendants' brief, is as follows:
 ". . . Once the attorney has considered all the facts, he must then arrive at a conclusion of the ultimate issue: Is the title marketable? This is not a mere question of a good title or bad title. It is a question of the amount of the risk an attorney should assume for his client. It requires an attorney to consider what other title examiners are likely to do when they come to pass upon the title. Never mind the case law definition of marketability. Case law may decree that a mere suspicion cast upon a title is not sufficient to make it unmarketable. Perkins vs. August, 109 Conn. 452, 456; or that a title is not unmarketable because the vendee is unwilling to accept it or because it is unsatisfactory to his attorney, Frank Towers Corp. vs. Laviana, 140 Conn. 45. 52. Yet, attorneys know that out in the marketplace, the attitude of those attorneys who examine and approve titles for the purpose of passing upon their marketability is of even greater importance. Therefore, regardless of what case law may decree, every attorney knows that he owes a duty to his client to advise him not only whether, in his opinion, the CT Page 1423 particular title is good, but whether it is likely to be acceptable to a subsequent attorney acting for a potential purchaser or mortgage lender. From the attorney's point of view, a "marketable title" is not merely one which can be forced upon an unwilling purchaser. In actual practice, it is a title which will be accepted by another attorney who may be called upon to appraise the title at a later time. Therefore, although an attorney may himself be willing to waive a particular defect or irregularity as one which does not impair the title's validity or subject the owner to a conflicting claim, he must try to anticipate, whether there is a possibility that another attorney may subsequently reject the title, or, at least, demand that the defect be removed or the purchase price reduced as a condition of approving it." (Emphasis added). The evidence before the court is that the title insurance company would have excepted the SWA from the title policy coverage. Further, Mr. Nugent testified that the attorney for the bank to which the defendants had applied for a mortgage was questioning the SWA and was demanding some protection from any judgment and ensuing consequences, or the complete removal of the SWA.
On the basis of this evidence the court concludes that the title in question was unmarketable and that the defendants were justified in refusing to close title to the property. The court cannot find that this title was "free from reasonable doubt, in law or in fact."
 II
Since other issues arose in the course of the hearing on this application which bear on the underlying issue, the court will address them.
The plaintiff stressed the fact that eventually it was successful in eliminating the SWA and thus removed it from the claim of title.
Unfortunately, the defendants' lives could not be placed on hold while this course of action was pursued. The court heard evidence that the house they owned in Madison was scheduled for a closing and their three young children were transferring to the Woodbridge school system. Thus, the defendants had dual CT Page 1424 dilemmas facing them and neither one presented them with time to pick their way through alternatives.
Of significance too is the fact that the existence of the SWA and its terms were not disclosed to the defendants by the plaintiff so that they learned of the problem literally days before the closing.
In his conversations with Karen Restifo, Michael Picard explained the ownership of the pond on the property but he admitted on cross examination that he never mentioned the SWA. He also conceded that the existence of the SWA could affect the property value and have an impact in the future.
The plaintiff shrugs off the exposure created by the SWA, urging that since Mr. Ballou, an expert in this field of engineering, minimized the chances for ponding or flooding to occur, there was really no risk involved. The court finds little solace for the defendants in this opinion. As it existed, this could be perceived by the defendants and any potential purchaser from them as a "Sword of Damocles" hanging over their heads.
As such, it should have been disclosed to the defendants, particularly in light of the conversation with Karen Resifo in the course of which she expressed concerns over "problems every time it rained."
The plaintiff also argues that since the SWA was required by the Woodbridge Inland Wetland Commission it should be considered a restriction imposed by a governmental authority and therefore not a defect affecting marketable title.
The short answer to that proposition is that, assuming arguendo that that theory is correct (and the court does not believe it is), these defendants should not be saddled with it because of a failure to disclose such a significant factor.
 CONCLUSION
It is therefore the conclusion of the court that the application for a prejudgment remedy should be denied.
Inasmuch as the extra work in the amount of approximately $51,000 was contracted for and performed before the CT Page 1425 disclosure of the title problem and the plaintiff should have disclosed the SWA long before it was discovered, this is an expense the plaintiff will have to assume.
Anthony V. DeMayo, Judge Trial Referee